ZACHARY, Judge.
 

 *491
 
 Phoebe Williford (petitioner) appeals from an order by the trial court that affirmed the final agency decision of the North Carolina Department of Health and Human Services ("DHHS") and DHHS' Division of Medical Assistance ("DMA") (collectively, respondents), that terminated petitioner's entitlement to medical assistance benefits ("Medicaid"). On appeal, petitioner argues that the trial court erred by finding and concluding that the funds in petitioner's Workers Compensation Set-Aside Account were a countable resource for purposes of determining petitioner's eligibility for Medicaid. For the reasons that follow, we agree.
 

 *492
 

 I. Factual and Procedural Background
 

 Petitioner was born on 8 November 1948, and is now a 68 year old widow. On 25 November 2005, petitioner suffered a workplace injury to her left arm and right knee; plaintiff has not been employed since she was injured. Petitioner sought and obtained workers' compensation medical and disability benefits from her employer. Petitioner became eligible for Medicare on 8 November 2009, when she reached 65 years of age. Petitioner received medical treatments for her injury, which were paid for with workers' compensation medical benefits. After several years of medical treatment, petitioner and her employer disagreed about the degree of permanent impairment of petitioner's left arm and right knee, and about the likelihood that petitioner's workplace injuries would require further medical treatment. The parties engaged in mediation and reached an agreement resolving the contested issues related to petitioner's workers' compensation claim.
 

 On 19 April 2011, the Industrial Commission entered an order pursuant to
 
 N.C. Gen. Stat. § 97-17
 
 , that incorporated the parties' settlement agreement. In its order, the Commission concluded that the settlement agreement was "fair and just" and properly addressed the interests of all parties. The terms of the settlement agreement included a provision awarding petitioner a lump sum
 
 [1]
 
 for workers' compensation disability payments and attorney's fees. The agreement also provided that petitioner's employer would contribute $46,484.12 to fund a Workers' Compensation Medicare Set-Aside Account (WCMSA), which represented the parties' settlement of all future workers' compensation medical benefits for which petitioner's employer would be liable and that would otherwise be paid by Medicare.
 

 When petitioner reached 65 years of age, she applied for and received assistance with her medical expenses pursuant to Medicaid for the Aged. Medicaid, a state and federal program discussed in detail below, provides funds for the medical expenses of applicants who meet various requirements and whose income and financial resources are below a specified amount. The requirement that is relevant to this appeal is that an applicant who is single and is over 65 years old may
 
 *846
 
 have no more than $2000 in liquid assets, such as bank accounts. The dispositive issue in this case is whether respondents properly classified the funds in petitioner's WCMSA as a financial resource for purposes of determining petitioner's eligibility for Medicaid.
 
 *493
 
 On 27 December 2013, a local hearing officer for the Sampson County Department of Social Services (DSS) issued a decision terminating petitioner's eligibility for Medicaid, on the grounds that the funds in petitioner's WCMSA, which were then approximately $46,630, were a countable resource. Inclusion of petitioner's WCMSA in the calculation of her liquid assets resulted in respondents' conclusion that petitioner had more than $48,000 in countable resources. Petitioner appealed the decision of the local hearing officer to DHHS. On 10 June 2014, DHHS issued a "tentative decision" concluding that petitioner's WCMSA was a countable resource, and affirming the decision by DSS to terminate petitioner's Medicaid benefits. DHHS issued its final agency decision on 11 July 2014, in which it affirmed the tentative decision. On 30 July 2014, petitioner filed a petition for judicial review, and on 31 August 2015 the trial court conducted a hearing on this matter. On 8 February 2016, the trial court entered an order denying petitioner's petition for judicial relief and affirming DHHS's ruling that the funds in petitioner's WCMSA were a countable resource for purposes of determining her eligibility for Medicaid. Petitioner noted a timely appeal to this Court from the trial court's order.
 

 II. Standard of Review
 

 Respondent DHHS is a North Carolina State agency. The standard of review of an administrative agency's decision is set out in N.C. Gen. Stat. § 150B-51 (2015), which "governs both trial and appellate court review of administrative agency decisions."
 
 N.C. Dept. of Correction v. Myers
 
 ,
 
 120 N.C.App. 437
 
 , 440,
 
 462 S.E.2d 824
 
 , 826 (1995),
 
 aff'd per curiam
 
 ,
 
 344 N.C. 626
 
 ,
 
 476 S.E.2d 364
 
 (1996). N.C. Gen. Stat. § 150B-51 provides that:
 

 (b) The court reviewing a final decision may affirm the decision or remand the case for further proceedings. It may also reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the findings, inferences, conclusions, or decisions are:
 

 (1) In violation of constitutional provisions;
 

 (2) In excess of the statutory authority or jurisdiction of the agency or administrative law judge;
 

 (3) Made upon unlawful procedure;
 

 (4) Affected by other error of law;
 

 (5) Unsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or
 
 *494
 
 (6) Arbitrary, capricious, or an abuse of discretion.
 

 (c) ... With regard to asserted errors pursuant to subdivisions (1) through (4) of subsection (b) of this section, the court shall conduct its review of the final decision using the
 
 de novo
 
 standard of review. With regard to asserted errors pursuant to subdivisions (5) and (6) of subsection (b) of this section, the court shall conduct its review of the final decision using the whole record standard of review.
 

 "Under the whole record test, the reviewing court must examine all competent evidence to determine if there is substantial evidence to support the administrative agency's findings and conclusions."
 
 Henderson v. N.C. Dep't of Human Resources
 
 ,
 
 91 N.C.App. 527
 
 , 530,
 
 372 S.E.2d 887
 
 , 889 (1988). "Where the petitioner alleges that the agency decision was based on error of law, the reviewing court must examine the record
 
 de novo
 
 [.] ... Under a
 
 de novo
 
 review, the court considers the matter anew and freely substitutes its own judgment for that of the [trial court]."
 
 Blackburn v. N.C. Dep't of Public Safety
 
 , --- N.C. App. ----, ----,
 
 784 S.E.2d 509
 
 , 518 (internal quotations omitted),
 
 disc. review denied
 
 , --- N.C. ----,
 
 786 S.E.2d 915
 
 (2016). In the present case, the facts are largely undisputed and we will apply a
 
 de novo
 
 standard of review to the legal issues raised in this appeal.
 

 III. Eligibility for Medicaid: Legal Principles
 

 A. Introduction
 

 "The Medicaid program was established by Congress in 1965 to provide federal assistance
 
 *847
 
 to states which chose to pay for some of the medical costs for the needy. Whether a state participates in the program is entirely optional. 'However, once an election is made to participate, the state must comply with the requirements of federal law.' "
 
 Correll v. Division of Social Services
 
 ,
 
 332 N.C. 141
 
 , 143,
 
 418 S.E.2d 232
 
 , 234 (1992) (quoting
 
 Lackey v. N.C. Dept. of Human Resources
 
 ,
 
 306 N.C. 231
 
 , 235,
 
 293 S.E.2d 171
 
 , 175 (1982) ) (other citation omitted). Accordingly, N.C. Gen. Stat. § 108A-56 (2015) states in relevant part that "[a]ll of the provisions of the federal Social Security Act providing grants to the states for medical assistance are accepted and adopted, and the provisions of this Part shall be liberally construed in relation to such act so that the intent to comply with it shall be made effectual."
 

 B. Eligibility for Medicaid Benefits
 

 "North Carolina's Medicaid program is supervised and administered by Respondent Division of Medical Assistance (DMA), an agency
 
 *495
 
 within the Department of Health and Human Services (DHHS)."
 
 Ass'n for Home & Hospice Care, Inc. v. Div. of Med. Assistance,
 

 214 N.C.App. 522
 
 , 523,
 
 715 S.E.2d 285
 
 , 287 (2011). DMA is "authorized to adopt ... rules to implement or define the federal laws and regulations, the North Carolina State Plan of Medical Assistance ... [and] the terms and conditions of eligibility for applicants and recipients of the Medical Assistance Program[.]" N.C. Gen. Stat. § 108A-51.1B(a) (2015). These rules are set out in the North Carolina Administrative Code (NCAC) and include, as relevant to this appeal, the following:
 

 10A NCAC 23A .0102.
 

 (57) "Reserve" means assets owned by members of the budget unit and that have a market value.
 

 10A NCAC 23E .0202.
 

 (a) North Carolina has contracted with the Social Security Administration under Section 1634 of the Social Security Act to provide Medicaid to all SSI recipients. Resource eligibility for individuals under any Aged, Blind, and Disabled coverage group shall be determined based on standards and methodologies in Title XVI of the Social Security Act[.] ...
 

 ...
 

 (i) The limitation of resources held for reserve for the budget unit shall be as follows: ... (2) for aged, blind, and disabled cases, two thousand dollars ($2000.00) for a budget unit of one[.]
 

 10A NCAC 23E .0207 RESERVE
 

 (d) For all aged, blind, and disabled cases, the resource limit, financial responsibility, and countable and non-countable assets are based on standards and methodology in Title XVI of the Social Security Act[.]
 

 These rules establish that in North Carolina eligibility for Medicaid is determined utilizing the federal standard for determining eligibility for Supplemental Security Income (SSI). Therefore, we next review the federal statutes and standards that are relevant to determining whether the WCMSA is an asset that should be included in calculating petitioner's financial reserves.
 

 *496
 
 In the Code of Federal Regulations ("C.F.R."),
 
 20 C.F.R. § 416.1205
 
 states that an "aged, blind, or disabled" applicant for SSI must, in addition to meeting all other eligibility requirements, have no more than $2000 in "nonexcludable resources." Thus, respondents and petitioner are in agreement that petitioner may have no more than $2000 in countable assets. 20 C.F.R. 416.1201 defines "resources" in relevant part as follows:
 

 § 416.1201. Resources; general.
 

 (a) Resources; defined.... [R]esources means cash or other liquid assets ... that an individual ... owns and could convert to cash to be used for his or her support and maintenance.
 

 (1) If the individual has the right, authority or power to liquidate the property ... it is considered a resource....
 

 The Social Security Administration (SSA) also issues a Program Operations Manual System, known as POMS, that instructs SSA employees on the SSA's interpretation of eligibility standards for SSI. "The POMS represent the 'publicly available operating instructions for processing Social Security claims.' The Supreme Court has stated that '[w]hile these administrative interpretations
 
 *848
 
 are not products of formal rulemaking, they nevertheless warrant respect.' "
 
 Kelley v. Comm'r of Soc. Sec
 
 .,
 
 566 F.3d 347
 
 , 351 n.7 (3rd Cir. 2009) (quoting
 
 Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler
 
 ,
 
 537 U.S. 371
 
 , 385,
 
 123 S.Ct. 1017
 
 ,
 
 154 L.Ed.2d 972
 
 (2003) ).
 

 Several POMS sections are relevant to the issues raised in this case. POMS SI 01110.100B. provides that "resources" are "cash and any other personal property" that an individual "owns; has the right, authority, or power to convert to cash [and]; is not legally restricted from using for [her] support and maintenance." Similarly, POMS SI 01120.010B.2. states in pertinent part that in order for an asset to be a countable resource, an "individual must have a legal right to access property. Despite having an ownership interest, property cannot be a resource if the owner lacks the legal ability to access funds[.]"
 

 POMS SI 01120.010D gives several examples of assets that, although owned by an applicant, are not countable resources. One of these is set out in POMS SI 01120.010D.2., and describes a situation in which a court order requires an applicant to retain ownership of the house where his ex-wife resides with the applicant's children until the applicant's children reach the age of majority. POMS SI 01120.010D.2. states
 
 *497
 
 that in that situation the applicant "is legally barred from converting [the house] to cash to be used for his own support and maintenance" and that as a result the house "is not his resource until ... his younger son's eighteenth birthday." Another example set out in POMS SI 01120.010 is the circumstance in which an SSI recipient is awarded damages "to be used solely for medical expenses related to the accident." POMS SI 01120.010D.5. states that in that situation, "[a]lthough [the SSI recipient] owns the funds and has direct access to them, he is not legally free to use them for his own support and maintenance. Therefore the award funds are neither income nor resource." Finally, POMS SI 01110.115A. states SSA's "general rule" that "[a]ssets of any kind are not resources if the individual does not have ... the legal right, authority, or power to liquidate them ... or the legal right to use the assets for [her] support and maintenance."
 

 As discussed above, in North Carolina eligibility for Medicaid is determined by reference to the standards applicable to eligibility for SSI. We conclude that these federal standards clearly establish that, in order for a given asset to be a countable resource, the asset must be
 
 legally
 
 available to the applicant
 
 without legal restriction
 
 on the applicant's authority to use the resource for support and maintenance. In reaching this conclusion, we are aware that 20 C.F.R. 416.1201(a)(1) states that if an applicant "has the right, authority or power to liquidate the property ... it is considered a resource," while the POMS defines a countable resource as an asset that an applicant "owns; has the right, authority, or power to convert to cash [and]; is not
 
 legally
 
 restricted from using for [her] support and maintenance." We easily conclude that the phrase "right, authority or power to liquidate" refers to the
 
 legal
 
 right or authority to access funds:
 

 The [appellants] rely on ... a federal regulation defining "resources" for purposes of an eligibility determination. The regulation provides: "If the individual has the right, authority or power to liquidate the property or his or her share of the property, it is considered a resource." ...
 
 20 C.F.R. § 416.1201
 
 (a)(1). Consistent with the agency's interpretation, Social Security Administration, Program Operations Manual Systems § SI 01110.115.A, and the federal government's litigating position ... we think the regulation naturally
 
 refers to a "legal" right, authority, or power to liquidate. What other sort of "right" or "power" would be at issue
 
 ? If the regulation merely referred to a raw power to liquidate-even in breach of the contract or
 
 *498
 
 violation of law-then it would impose virtually no limitation, for a pair of unscrupulous actors can reduce almost anything of value to a dollar amount.
 

 Geston v. Anderson
 
 ,
 
 729 F.3d 1077
 
 , 1083 (8th Cir. N.D. 2013) (emphasis added).
 

 This conclusion is also supported by "the North Carolina Adult Medicaid Manual, which is an 'internal instructional reference
 
 *849
 
 for DHHS employees in the application of DHHS policy and interpretation of the federal Medicaid requirements.' "
 
 Joyner v. N.C. HHS
 
 ,
 
 214 N.C.App. 278
 
 , 288,
 
 715 S.E.2d 498
 
 , 505 (2011) (quoting
 
 Martin v. N.C. Dep't of Health and Human Servs
 
 .,
 
 194 N.C.App. 716
 
 , 720,
 
 670 S.E.2d 629
 
 , 633 (2009) ). Medicaid Manual § 2230 I.A. states that for purposes of determining an applicant's eligibility for Medicaid, resources are financial assets that an applicant "owns, or has the right, authority, or power to convert to cash" and that are "legally available for the [applicant's] support and maintenance." Medicaid Manual § 2230 IV.A.2. specifies that "[r]esources are considered available unless the [applicant] shows evidence of legal restraints such as judgments, estates, boundary disputes or legally binding agreements."
 

 C. Medicare Secondary Payer Act and WCMSAs
 

 The instant case also requires consideration of the Medicare Secondary Payer Act. "Medicare is a federal program providing subsidized health insurance for the aged and disabled.
 
 See
 

 42 U.S.C. § 1395
 

 et seq
 
 ."
 
 Almy v. Sebelius
 
 ,
 
 679 F.3d 297
 
 , 299 (4th Cir. Md. 2012),
 
 cert. denied
 
 , --- U.S. ----,
 
 133 S.Ct. 841
 
 ,
 
 184 L.Ed.2d 653
 
 (2013).
 

 For the first fifteen years, Medicare paid for medical services without regard to whether they were also covered by an employer group health plan. However, in 1980, Congress enacted a series of amendments, commonly referred to as the Medicare Secondary Payer ("MSP") provisions, which were designed to make Medicare a "secondary payer" with respect to such a plan.
 

 Wilson v. United States
 
 ,
 
 405 F.3d 1002
 
 , 1005 (Fed. Cir. 2005). One of these provisions is 42 U.S.C. § 1395y(b)(2)(A)(ii) (2015), which states that Medicare coverage is not available if "payment has been made or can reasonably be expected to be made under a workmen's compensation law[.]" In order to comply with the MSP statute, in workers' compensation cases, "CMS mandates the creation of a Medicare "set aside" ("MSA") account.
 
 42 C.F.R. § 411
 
 . The purpose of a MSA is to allocate a
 
 *499
 
 portion of a workers' compensation award to pay potential future medical expenses resulting from the work-related injury so that Medicare does not have to pay."
 
 Aranki v. Burwell
 
 ,
 
 151 F.Supp.3d 1038
 
 , 1040 (D. Ariz. 2015). A WCMSA "is a financial agreement that allocates a portion of a workers' compensation settlement to pay for future medical services related to the workers' compensation injury[.] ... These funds must be depleted before Medicare will pay for treatment related to the workers' compensation injury[.]" Workers' Compensation Medical Set Aside Arrangements, https://www.cms.gov. The funds in a WCMSA must be deposited into an interest-bearing account, and the WCMSA may be administered by the workers' compensation claimant or by a professional administrator. The administrator must submit an annual accounting of any expenditures from the WCMSA. If funds in a WCMSA are used for any purpose other than medical expenses that arise from the claimant's compensable injury and would otherwise be payable by Medicare, then Medicare will refuse to pay for any medical expenses that were intended to be covered by the WCMSA until the claimant has replaced the funds and has then depleted them according to the WCMSA.
 
 See
 
 WCMSA Reference Guide, https://www.cms.gov/.
 

 IV. Discussion
 

 Petitioner argues that the funds in the WCMSA are not a countable resource for purposes of determining her eligibility for Medicaid, because her use of the funds for her support and maintenance is subject to "legal restrictions" pursuant to a "legally binding agreement." We agree.
 

 In this case, the Industrial Commission entered an order that incorporated the settlement agreement reached by petitioner and her employer and stated that:
 

 After giving due consideration to all matters involved in this case in accordance with Chapter 97, G.S. 97-17 ... the compromise settlement agreement is deemed by the Commission to be fair and just[.] ... The agreement is incorporated herein by reference and is approved[.] ... $46,484.12 shall be paid by Defendants to fund Plaintiff's Medicare Set-Aside Account.... It is to be noted, however, that
 
 *850
 
 this Order does not purport to approve, resolve or address any issue or matter over which the Industrial Commission has no jurisdiction[.]
 

 The Settlement Agreement that was incorporated into the Commission's order provided, as relevant to this appeal, the following:
 

 *500
 
 ...
 

 The parties to this agreement hereby waive further hearings before the North Carolina Industrial Commission and, in presenting this Agreement for approval, represent that they have made available to the Commission with said Agreement all material medical and rehabilitation reports known to exist.
 

 ...
 

 Since the date on which [petitioner] sustained an injury by accident ... [she] has not returned to a job or position at the same or greater average weekly wage as she had on that date.
 

 ...
 

 [Petitioner's] Workers' Compensation Claim has been accepted by Employer and Carrier. [Petitioner] is receiving social security disability benefits. The parties have agreed to settle [petitioner's] workers' compensation claim for the lump sum of [amount is blacked out] subject to the attribution set forth below.
 

 ...
 

 The defendants agree to fund a Medicare Set Aside account in the amount of $46,484.12. These funds are for future medical treatment related to [petitioner's] compens[able] injuries.
 

 ....
 

 The parties agree that the cost of future medical care is in dispute. As a compromise, the Parties agree in addition to the settlement amount listed above [amount blacked out], [that] $46,484.12 (hereinafter referred to as "MSA Fund") shall be allocated to release [petitioner's employer and carrier from] all liability for future Medicare-covered medical expenses[.]
 

 ...
 

 It is not the intention of the Employer or the Carrier to shift responsibility [for] future medical benefits to the Federal Government. The MSA Fund for future Medicare-covered
 
 *501
 
 expenses is intended directly for payment of these expenses. Upon receipt of tangible evidence that the Medicare-covered expenses exceed the MSA Fund, those expenses will be forwarded to Medicare for payment of covered expenses with proper documentation, provided [petitioner] satisfies all of the Medicare program requirements at that time.
 

 ...
 

 [Petitioner] understands and agrees that she is administering the Medicare Allocation as a self-administered plan[.]
 

 ...
 

 A. [Petitioner] shall open an interest bearing bank account for the Medicare Allocation and shall disburse only payments for Medicare-covered expenses which are work related from said account.
 

 B. [Petitioner] shall not pay non-Medicare-covered expenses from this account[.] ...
 

 C. [Petitioner] shall not pay any Medicare-covered expenses from this account that are unrelated to the work injury.
 

 ...
 

 F. If payments from this account are used to pay for services that are not covered by Medicare, Medicare will not pay injury-related claims until these funds are restored to the set-aside account and then properly exhausted. In this circumstance, [petitioner] is responsible for restoring such funds to the account.
 

 ...
 

 I. Even if [petitioner] is a Medicare Beneficiary, [petitioner] understands that Medicare will not pay for any expenses related to the work injury until, and unless, the [petitioner] can provide documentation indicating that the entire MSA account, including any accrued interest, was properly expended on Medicare-covered treatments and expenses related to the work injury covered by this Settlement Agreement.
 

 *502
 
 J. [Petitioner] must maintain accurate records of all expenses made from the Medicare Allocation[.] ...
 

 *851
 
 K. [Petitioner] must prepare and submit an annual report to ... include summaries of any transactions on, and status of, the MSA account.
 

 "Settlement agreements between the parties, approved by the Commission pursuant to N.C.G.S. § 97-17, are binding on the parties and enforceable, if necessary, by court decree."
 
 Saunders v. Edenton Ob/Gyn Ctr
 
 .,
 
 352 N.C. 136
 
 , 139,
 
 530 S.E.2d 62
 
 , 64 (2000) (citing
 
 Pruitt v. Publishing Co
 
 .,
 
 289 N.C. 254
 
 , 258,
 
 221 S.E.2d 355
 
 , 358 (1976) ("... [I]t has been uniformly held that an agreement for the payment of compensation, when approved by the Commission, is as binding on the parties as an order, decision or award of the Commission unappealed from, or an award of the Commission affirmed upon appeal.")). "The Commission or any member or deputy thereof shall have the same power as a judicial officer ... to hold a person in civil contempt ... for failure to comply with an order of the Commission, Commission member, or deputy."
 
 N.C. Gen. Stat. § 97-80
 
 (g) (2015). We conclude that the Commission's order is a legally binding agreement.
 

 Petitioner produced evidence that, pursuant to the terms of a Settlement Agreement that was incorporated into an order of the Industrial Commission, she may
 
 only
 
 use the funds in the WCMSA for (1) medical expenses (2) arising from her compensable injury (3) for which Medicare would otherwise be liable. If petitioner uses the WCMSA funds for any other purpose, Medicare will not pay for treatment for her compensable injury until she replaces the funds and then depletes them in accordance with the WCMSA. Specifically, petitioner
 
 may not
 
 use the funds in the WCMSA for her general support and maintenance. In addition, petitioner could be held in contempt of court for violating the terms of the Commission's order which incorporated the WCMSA. We hold that because petitioner established that the terms of a "legally binding agreement" impose "legal restrictions" on her use of the WCMSA funds, the trial court erred by affirming the agency decision of DHHS that treated the WCMSA as a countable resource for purposes of determining petitioner's eligibility for Medicaid. In reaching this conclusion, we have carefully considered respondents' arguments for a contrary result, but do not find them persuasive.
 

 Respondents argue that the WCMSA is a countable resource on the grounds that petitioner's access to the WCMSA funds is not restricted by the bank in which the funds are deposited. We conclude that this fact
 
 *503
 
 is not relevant to the determination of whether petitioner's use of the funds is restricted pursuant to a legally binding agreement.
 

 Respondents also direct our attention to § 2330 of the North Carolina Adult Medicaid Manual, which discusses the financial resources of an applicant for Medicaid. As discussed above, § 2330 IV.A.2. states that the financial assets of an applicant "are considered available unless the [applicant] ... shows evidence of legal restraints such as judgments, estates, boundary disputes, or legally binding agreements." A settlement agreement that is incorporated into an order of the Industrial Commission is binding on the parties involved, and is an order that is enforceable by court decree or contempt proceedings. Accordingly, the order, and the WCMSA that is a part of the order, is by definition a "legally binding agreement."
 

 Respondents do not dispute these facts; instead their argument is based on language found in § 2330 IV.C. of the Medicaid Manual. § 2330 IV.C.2. states that "[a]ssets may not be available if there is a pre-existing agreement in which the [applicant] holds assets for another party but does not have an ownership interest. The pre-existing agreement is called a 'resulting trust' or is sometimes referred to as a 'legally binding agreement.' " Respondents' position is that because the Manual includes the phrase "legally binding agreement" in its discussion of resulting trusts, the
 
 only
 
 type of legally binding agreement that might impose legal restrictions upon an applicant's use of funds is a "resulting trust." This argument is without merit, for several reasons.
 

 First, it is not clear why respondents employed the phrase "legally binding agreement" in conjunction with its discussion of a resulting trust.
 

 *852
 
 Trusts are classified in two main divisions: express trusts and trusts by operation of law.... [A]n express trust is based upon a direct declaration or expression of intention, usually embodied in a contract; whereas a trust by operation of law is raised by rule or presumption of law
 
 based on acts or conduct, rather than on direct expression of intention
 
 .... [T]he creation of a resulting trust involves the application of the doctrine that valuable consideration rather than legal title determines the equitable title resulting from a transaction[.]
 

 Bowen v. Darden
 
 ,
 
 241 N.C. 11
 
 , 13,
 
 84 S.E.2d 289
 
 , 292 (1954) (emphasis added) (citations omitted). "A trust of this sort does not arise from or depend on any agreement between the parties. It results from the fact that one man's money has been invested in land and the conveyance
 
 *504
 
 taken in the name of another."
 
 Teachey v. Gurley
 
 ,
 
 214 N.C. 288
 
 , 292,
 
 199 S.E. 83
 
 , 86-87 (1938).
 

 Thus, a resulting trust is an equitable remedy that is applied in appropriate factual circumstances notwithstanding the
 
 absence
 
 of any express or binding agreement between the parties. Respondents do not cite any authority for their position that "legally binding agreement" is a synonym for a "resulting trust," and do not explain their use of the phrase "legally binding agreement" in the discussion of resulting trusts. In addition, although respondents assert that "for Medicaid purposes" a legally binding agreement must meet the definition of a resulting trust, they do not contend that the Manual includes among its enumerated definitions a definition of the phrase "legally binding agreement" that supports their position.
 

 Moreover, even assuming,
 
 arguendo
 
 , that respondents employ an internal definition of the term "legally binding agreement" as being synonymous with "resulting trust," this would not change the outcome of this case. Respondents concede that in North Carolina an applicant's eligibility for Medicaid is determined in accordance with SSI regulations. As discussed above, both the federal and state regulations provide that a financial asset is not a countable resource if an applicant's use of funds for support and maintenance is subject to legal restrictions arising from a legally binding agreement. In the event of a conflict between the Manual and federal regulations, our decision would be governed by the SSI regulations:
 

 The principal authority upon which DHHS relied in concluding that [petitioner is not eligible for Medicaid benefits] was the North Carolina Adult Medicaid Manual, which is an "internal instructional reference for DHHS employees in the application of DHHS policy and interpretation of the federal Medicaid requirements." ... Although the provisions of the Medicaid Manual are clearly entitled to some consideration in attempts to understand the rules and regulations governing eligibility for Medicaid benefits, we have previously stated that the Medicaid Manual "merely explains the definitions that currently exist in federal and state statutes, rules and regulations" and that "[v]iolations of or failures to comply with the MAF [Medicaid] Manual [are] of no effect" unless the act or omission in question amounts to a "failure to meet the requirements set out in the federal and state statutes and regulations[.]"
 

 *505
 

 Joyner
 
 , 214 N.C.App. at 288-89, 715 S.E.2d at 505-06 (quoting
 
 Martin
 
 ,
 
 194 N.C.App. at 720
 
 ,
 
 670 S.E.2d at 633
 
 , and
 
 Okale v. N.C. Dept. of Health and Human Servs
 
 .,
 
 153 N.C.App. 475
 
 , 478-79,
 
 570 S.E.2d 741
 
 , 743 (2002) ) (other citations omitted). "[I]n the event of a conflict between federal and state Medicaid statutes, the federal statutes must be deemed controlling."
 
 Joyner
 
 at 284, 715 S.E.2d at 503. Given that N.C. Gen. Stat. § 108A-58.1(l)(1) explicitly states that "[t]his section shall be interpreted and administered consistently with governing federal law" we will not adopt the interpretation of "legally binding agreement" proposed by respondents, as it would place North Carolina out of compliance with the applicable federal regulations.
 

 Respondents also assert that the funds in the WCMSA are a countable resource on the grounds that the Industrial Commission order is not "binding" upon respondents and, as a result, does not constitute a legally binding agreement. Respondents offer no basis for their suggestion that
 
 *853
 
 a binding agreement must be "binding" upon DHHS. In addition, respondents emphasize that the order includes language acknowledging that the determination of petitioner's eligibility for needs-based entitlement programs is not within the jurisdiction of the Industrial Commission. We hold that the fact that the Industrial Commission's order states, accurately, that it does not purport to address issues outside its jurisdiction, has no bearing on the issues of whether the settlement agreement was binding upon petitioner, or upon whether it imposed legal restrictions on petitioner's use of the WCMSA funds.
 

 Respondents also maintain that the WCMSA "is clearly a type of Medical Health Savings Account funded by Medicare."
 

 When Congress enacted the Medicare Prescription Drug, Improvement, and Modernization Act in 2003, it created, among other things, a new type of tax-favored account-an HSA-to help eligible individuals save for medical expenses.... An individual can make contributions to an HSA only if that individual is separately covered by a 'high deductible health plan,' which is a health plan that requires beneficiaries to pay a certain amount of out-of-pocket expenses before the insurance plan begins picking up the tab.
 

 Roup v. Commer. Research, LLC
 
 ,
 
 349 P.3d 273
 
 , 276 (Colo. 2015),
 
 cert. denied
 
 , --- U.S. ----,
 
 136 S.Ct. 797
 
 ,
 
 193 L.Ed.2d 723
 
 (2016). Respondents fail to articulate any legal basis for their argument that a WCMSA is "a type of" HSA, and we conclude that this argument lacks merit.
 

 *506
 
 For the reasons discussed above, we conclude that the Industrial Commission's order was a legally binding agreement, and that the WCMSA, which was incorporated into the order, barred petitioner from using the funds in the WCMSA for her support or maintenance. We hold that petitioner established that her use of the WCMSA funds was subject to legal restrictions arising from a legally binding agreement, and that the trial court erred by affirming respondents' ruling that the WCMSA was a countable resource. Having reached this conclusion, we find it unnecessary to address certain issues raised by the parties on appeal, including the degree of deference that should be accorded to a CMS memorandum, whether petitioner might have chosen to create a special needs trust instead of a WCMSA, or whether the trial court made its own findings of fact. We conclude that the WCMSA is not a countable resource for purposes of determining petitioner's eligibility for Medicaid, and that the trial court's order must be
 

 REVERSED.
 

 Judges STROUD and McCULLOUGH concur.
 

 [1]
 

 The dollar amount of the settlement payment for disability and attorney's fees is blacked out in the copy of the agreement contained in the record.